IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Theresa Tenaglia,          )
                                  )
                Plaintiff,    )
                                  )
      vs.                  )
                                  )
Carolyn W. Colvin, Acting    )
Commissioner of Social Security,   )
                                  )
              Defendant.   )
                                  )

Civil Action No.  6:14-4920-RBH-KFM

**REPORT OF MAGISTRATE JUDGE**

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B). [1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on April 1, 2010, alleging that she became unable to work on June 1, 2009.  The applications were denied initially and on reconsideration by the Social Security Administration.  On August 9, 2011, the plaintiff requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

appeared on September 13, 2012 (Tr. 72-100), considered the case *de novo*, and on October 24, 2012, found that the plaintiff did not have a disability as defined in the Social Security Act, as amended (Tr. 125-36). The plaintiff filed a timely request for review ith the Appeals Council (Tr. 143-47). On September 20, 2013, the Appeals Council remanded the case and directed the ALJ to specifically:

> Consider whether the doctrine of res judicata applies to the current application (HALLEX I-2-4-40).

> Update the record and obtain any available additional evidence concerning the claimant's impairments from her treating sources.

> Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 C.F.R. §§ 404.1545 and 416.945 and Social Security Ruling 85-16 and 96-8p).

> Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-14 and 96-9p). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will as the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 C.F.R. §§ 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

> Determine whether the claimant has a medically determined substance abuse disorder. If it is determined that the claimant has a substance abuse disorder, the Administrative Law Judge will then determine whether the claimant is disabled based upon all impairments, including the substance abuse disorder. If it is determined that the claimant is disabled, the Administrative Law Judge will then determine if the substance abuse disorder is material to the finding of disability in accordance with the procedures set forth in 20 C.F.R. §§ 404.1535 and 416.935 and Social Security Ruling 13-2p.

(Tr. 145-46).

On March 12, 2014, the ALJ held a video hearing (Tr. 40-71). The plaintiff appeared at the hearing along with Arthur F. Schmitt, an impartial vocational expert. At the hearing, the plaintiff amended her alleged onset date of disability to December 2, 2009 (Tr. 19). On April 21, 2014, the ALJ found the plaintiff not disabled as defined in the Social Security Act, as amended (Tr. 19-31). The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on October 27, 2014 (Tr. 1-3). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.

(2)    The claimant has not engaged in substantial gainful activity since December 2, 2009, the amended alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: alcoholic cirrhosis/hepatitis; alcoholic seizures; and alcohol abuse (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a). Specifically, the claimant is able to lift and carry up to ten pounds occasionally and lesser amounts frequently, sit for 6 hours in an 8-hour day, and stand and walk occasionally. The claimant must avoid work at heights or around moving machinery. She is limited to understanding, remembering, and carrying out simple instructions. The claimant can occasionally

3

interact with co-workers and supervisors, but she must not have significant interaction with the public.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on September 16, 1966, and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.    The claimant subsequently changed age category to a younger individual age 45-49 (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from December 2, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."    42 U.S.C. § 423(a).    "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

4

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments

which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 42 years old on her amended alleged disability onset date and 47 years old on the date of the ALJ's decision. She completed high school and has an associate's degree and past relevant work as a waitress, hostess, and photographer (Tr. 30).

In November 1997, the plaintiff was involved in a motor vehicle accident.  She was dragged by a car while trying to help an individual who had been hit and was still inside his car.  She suffered a closed head injury, multiple fractures, and developed numbness in both thighs and her thoracic and cervical spine (Tr. 446-518).

On January 21, 2010, the plaintiff reported to her medical providers that her pain medication was stolen (Tr. 695).  The pharmacist refused to refill her prescription (*id.*).

On March 23, 2010, the plaintiff complained of bilateral leg pain (Tr. 693). She repeatedly asked for Vicodin to treat the neuropathy, but Christine McGinley, D.O., told her that Vicodin is not the appropriate treatment (Tr. 694).  Dr. McGinley referred the plaintiff to neurology (*id.*).

On September 18, 2010, the plaintiff spent the night as an inpatient at Seacoast Medical Center in Little River, South Carolina due to her liver disease (Tr. 658-86).  On September 22, 2010, the plaintiff saw her primary care physician Luis Insignares, M.D., of Little River Medical Center, regarding her alcoholic hepatitis and cirrhosis of the liver (Tr. 691).  Dr. Insignares referred the plaintiff to the hospital emergency room for further evaluation and testing (Tr. 692).

On September 23, 2010, the plaintiff reported to Grand Strand Regional Medical Center that she was experiencing worsening weakness, episodic fevers, and jaundice (Tr. 731).  The hospital admitted her, and she was given two units of blood because of rectal bleeding ("a lower GI bleed") (Tr. 736), which resolved and required no further workup (Tr. 742, 754).  She was also assessed with hepatic dysfunction, marked hepatomegaly, parancentesis.  Her laboratory work revealed increased International Normalized Ratio ("INR") at 2, decreased serum albumin of 1.8, elevated bilirubin, jaundice, and anemia with hemoglobin down to 8.5 (Tr. 730-739; 749-755; 757-777).  Her abdomen was distended, but her cultures were negative (Tr. 754, 1208). Erika King, M.D., diagnosed the plaintiff with alcoholic hepatitis (Tr. 742).  The hospital discharged her after 16 nights

in stable condition on October 9, 2010; she was "doing great" and had no complaints (Tr. 755).

On October 14, 2010, the plaintiff reported to Dr. Insignares that she was feeling much better and her jaundice was starting to fade (Tr. 765). Dr. Insignares found that her abdomen was normal (Tr. 766). On October 22, 2010, the plaintiff reported that she was feeling much better, her jaundice was clearing, and she had stopped drinking (Tr. 762). Dr. Insignares's musculoskeletal examination of the plaintiff was normal (Tr. 763).

On October 29, 2010, the plaintiff reported to Dr. Insignares that she was feeling better and her belly was back to normal (Tr. 760). She had no gastrointestinal pain, and the physical exam, including her abdomen, was normal (Tr. 760-61).

On January 4, 2011, the plaintiff reported that she felt better as the edema in her abdomen and ankles resolved (Tr. 850). The plaintiff reported to Dr. Insignares that she was experiencing hand and feet neuropathy (Tr. 808). Dr. Insignares's exam revealed decreased sensation in her feet (Tr. 851). Thereafter, on March 7, April 8, May 16, and May 25, 2011, and April 17 and December 4, 2012, Dr. Insignares's examinations did not indicate any decreased sensation; rather, the musculoskeletal and neurological exams were normal (Tr. 856, 858, 944, 964, 966-67, 1057).

On February 7, 2011, state agency medical consultant, Mary Lang, M.D., conducted a physical residual functional capacity ("RFC") assessment. Upon reviewing the plaintiff's medical records, Dr. Lang concluded that the plaintiff could occasionally lift/carry ten pounds, frequently lift/carry less than ten pounds, and stand/walk at least two hours and sit about six hours in an eight-hour workday (Tr. 828). Dr. Lang found that the plaintiff had unlimited pushing/pulling abilities (including operation of hand and foot controls), but was limited to frequent overhead reaching and frequent postural movements (Tr. 828-30). Dr. Lang explained that the plaintiff's alcoholic hepatitis improved clinically and objectively since her alcohol cessation (Tr. 828). Dr. Lang explained that the plaintiff had a high chronic liver

8

disease score, but within two months of sobriety, "all parameters markedly decreased such that no listing level severity" (*id*.).

On April 8, 2011, the plaintiff reported that she was not drinking, so her skin was clearing (Tr. 857). On that same date, Dr. Insignares wrote a one-paragraph letter stating that the plaintiff's chronic liver failure and chronic nerve damage disabled her, but that medication controlled her conditions (Tr. 836, 1253). As of April 20, 2011, testing showed that the plaintiff's ammonia and liver-function levels were improving (Tr. 872).

On March 4, 2012, EMS brought the plaintiff to Grand Strand following a motor vehicle accident (Tr. 1002). She alleged that she had a seizure while driving, which caused the accident (Tr. 1081). The plaintiff was hospitalized from March 14 to April 1, 2012. She reported at that time that she had not been drinking for the past 30 or 40 days. Lab results showed severe liver disease. Her serum albumin was down to 1.9 and dropped to 1.3 during her stay (Tr. 1001-47). She complained of "mild pain" throughout her body. All x-rays and CT scans were negative (Tr. 1006, 1007). Imaging on March 17, 2012, showed no evidence of ascites (build-up of fluid, which causes abdominal swelling) or pleural fluid (Tr. 1029).

On April 17, 2012, the plaintiff reported being seizure-free since beginning her medication (Tr. 943). She reported that she stopped taking her liver disease medications; consequently, her ammonia levels increased (*id*.). On April 24, 2012, the plaintiff was hospitalized for one night at Waccamaw Community Hospital for subglottic stenosis (Tr. 907-36). She was hospitalized again on April 25- 26, 2012 at the Medical University of South Carolina ("MUSC") for follow up of tracheal stenosis and cirrhosis. Natalie Steel Bradford, M.D., of MUSC, determined that the plaintiff's alcoholic cirrhosis was stable (Tr. 902). The plaintiff started to drink again and was not complying with her medication. On May 5, 2012, she had a positive blood ethanol level (Tr. 1053). On May 12, 2012, the

9

plaintiff reported having some drinks recently (Tr. 913). She was hospitalized on May 12-16 at MUSC for dyspnea and stridor (Tr. 904-06).

On March 1, 2013, the plaintiff reported having an "occasional wine" (Tr. 1051). The plaintiff complained of foot and hand numbness (Tr. 1051). Dr. Insignares noted "decreased sensation" (Tr. 1052).

As of October 2013, the plaintiff was not complying with her medications, and she was combining her medications with alcohol (Tr. 1139, 1142). On October 29, 2013, the plaintiff went to Conway Medical Center because of elevated ammonia levels. She denied nausea, weakness, swelling, and numbness. Her abdomen showed no distension or tenderness. Her serum albumin was down to 2.8, and her bilirubin was elevated to 13.6 (Tr. 1070, 1071). After the hospital provided her with medication, her condition "markedly improved"; the hospital did not admit her (id.).

On October 31, 2013, the plaintiff saw Dr. Insignares and requested "a letter stating that she has liver failure and is unable to work" (Tr. 1131). She complained of foot and hand pain and an inability to walk and write, but she admitted that she was drinking occasionally and was "cutting back" on her medications (id.). She reported no localized joint swelling or sensory disturbances (Tr. 1133). Dr. Insignares' examination revealed jaundice, "some ascites," and "some hepatomegaly," but no neurological problems (id.). Dr. Insignares restarted the plaintiff on her regular medicines and advised her to abstain from alcohol (Tr. 1135). On this date, Dr. Insignares wrote another one-paragraph letter stating that the plaintiff was "unable to work at this time, secondary to worsening Liver Function, and End Stage Liver Disease" (Tr. 1068). Dr. Insignares indicated that the plaintiff's peripheral neuropathy caused difficulties in lifting items, walking, and maintaining normal daily living activities (id.).

On November 13, 2013, the plaintiff went to the emergency room with complaints of abnormal lab results, but she reported no significant troubles with her liver.

10

The labs revealed decreased serum albumin to 1.9, and her INR was up to 1.77 (Tr. 1157-59).  She initially denied drinking, but then admitted that she still drank.  Ultrasound of the abdomen showed minimal ascites (Tr. 1157, 1169).  Richard H. Eisenman, M.D., ordered further testing and discharged her in stable condition on November 16, 2013 (Tr. 1151-61).  Dr. Eisenman noted that the plaintiff was jaundiced, and her lab work showed her synthetic function was poor, which indicated significant liver damage (Tr. 1159).  On November 22, 2013, Dr. Insignares' neurological exam was normal (Tr. 1128).

On December 5, 2013, Dr. Eisenman conducted an esophagogastroduodenoscopy to check for esophageal varices (Tr. 1154).  The procedure revealed "tiny esophageal varix" (Tr. 1155).  Biopsies of the gastric mucosa showed no significant abnormalities (Tr. 1156).

On January 8, 2014, her lab work showed her serum albumin remained low at 2.9 and bilirubin elevated at 4.7.  On January 23, 2014, her lab work was essentially the same with her serum albumin down to 2.7.  On January 28, 2014, the plaintiff returned to Little River Clinic reporting that she has been feeling dizzy at times and her blood pressure has been low.  Dr. Insignares diagnosed her as hypotensive (Tr. 1256-85).  Dr. Insignares' exam revealed a normal abdomen and no edema (Tr. 1264).  The plaintiff reported "tremendous pain" in her legs and hands (Tr. 1263).

The most recent lab work dated February 27, 2014, revealed her creatinine elevated to 5, serum albumin at 3, and bilirubin at 1.9 (Tr. 1259).  Dr. Insignares wrote another letter on this date.  Dr. Insignares stated that the plaintiff reported "excruciating pain that affected all limbs of her body," which prevents her from completing everyday tasks, such as opening a bottle of water "at times" (Tr. 1255).  Dr. Insignares further stated that, as a primary care physician, "there are many essential needs that [could] not be met" in his office, and the plaintiff "must obtain care for her end stage hepatic disorder up to and

11

including transplant" and her "severe neuropathy."  He referred her to a hepatologist and a neurologist, but she had not seen them because she was uninsured (*id*.).

On March 4, 2014, the plaintiff reported that she was abstaining from alcohol, and her ammonia level was back in the normal range.  The plaintiff stated that she had constant dizziness and had passed out (Tr. 1257). Dr. Insignares did not note any ascites; the plaintiff's abdomen was normal (Tr. 1259).  She reported "some pain from peripheral neuropathy, but higher dose of Lyrica seems to help" (Tr. 1257).  Dr. Insignares' exams in 2014 revealed "decreased sensation" in her feet (Tr. 1259, 1264, 1268), but the plaintiff denied joint swelling or sensory disturbances (Tr. 1258, 1267).

### Hearing Testimony

At the September 12, 2012, hearing, the plaintiff, who was 45 years old at the time, testified that she could no longer work because of hand and feet numbness and pain as a result of "nerve damage" following a 1997 car accident (Tr. 79-81).  She testified that when she tries to lift something, her hands "get clinched" "all of the sudden," and the item falls (Tr. 82).  She stated that she is so numb that she would not feel heat if she burns her hand or glass if she cuts her foot, and if a truck runs over her foot, she will only feel a little bit of pain (Tr. 83).

On March 12, 2014, upon Appeals Council remand, the plaintiff testified at a second administrative hearing.  She testified that her biggest problems that keep her from working are her pain, swelling, and numbness in her back, legs, and feet (Tr. 45, 48-50). She testified that the symptoms of her liver disease are that she worries a lot and has stomach pains (Tr. 47).  She stated that she can lift a gallon of milk sometimes, walk for five to ten minutes before needing to sit down, and sit for up to one-and-a-half hours at a time (Tr. 56-59).  She testified that she has a history of alcohol abuse, but had not had alcohol for about a year and a half (Tr. 62).

12

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to properly evaluate the medical opinions of Dr. Insignares and (2) failing to properly consider Listing 5.05 (pl. brief 9-14).

### Treating Physician

The plaintiff first argues that the ALJ erred in failing to properly consider the opinions of her treating physician, Dr. Insignares. The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the

13

> opinion should be rejected.  Treating source medical opinions
> are still entitled to deference and must be weighed using all of
> the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In
> many cases, a treating source's medical opinion will be entitled
> to the greatest weight and should be adopted, even if it does
> not meet the test for controlling weight.

*Id.* at *4.

As set forth in more detail above, Dr. Insignares wrote three letters opining that the plaintiff's peripheral neuropathy and liver disease disabled her.  First, on April 8, 2011, Dr. Insignares wrote a one-paragraph letter stating that the plaintiff's chronic liver failure, peripheral neuropathy, and chronic pain disabled her, but that medication controlled her conditions (Tr. 836, 1253).  He noted that he had referred her to a liver specialist and neurologist, but the plaintiff was unable to afford the evaluations (Tr. 836, 1253).  The ALJ found as follows with regard to this opinion:

> Specifically, I have considered the April 2011 opinion of Dr.
> Insignares that claimant is medically disabled.  (Exhibits 26F,
> 34F, 42F, and 47F).  I accord this opinion little weight as it is
> inconsistent with Dr. Insignares' March 2011 note that the
> claimant's end-stage liver disease is controlled with
> medications.  (Exhibits 26F and 34F).  Furthermore in April
> 2012, the claimant's alcoholic cirrhosis was assessed as stable
> with no evidence of encephalopathy. (Exhibit 31F).  While Dr.
> Insignares also noted that the claimant suffered from peripheral
> neuropathy and chronic pain from her condition, these
> symptoms were well-controlled with medication.  (Exhibits 26F,
> 27F, and 34F).  Additionally, treatment notes from November
> and December 2013 and January and March 2014 showed that
> the claimant's alcoholic cirrhosis was stable with medications.
> (Exhibits 44F, 45F, and 49F).

(Tr. 29).

On October 31, 2013, the plaintiff saw Dr. Insignares and requested "a letter stating that she has liver failure and is unable to work" (Tr. 1131). Dr. Insignares wrote another one-paragraph letter stating that the plaintiff was "unable to work at this time, secondary to worsening Liver Function, and End Stage Liver Disease" (Tr. 1068).  Dr.

14

Insignares also stated that the plaintiff's peripheral neuropathy caused difficulties in lifting items, walking, and maintaining normal daily living activities (*id*.).  On February 27, 2014, Dr. Insignares wrote another letter stating that the plaintiff reported "excruciating pain that affected all limbs of her body," which prevented her from completing everyday tasks, such as opening a bottle of water "at times" (Tr. 1255).  Dr. Insignares stated that, as a primary care physician, "there are many essential needs that [could] not be met" in his office, and the plaintiff "must obtain care for her end stage hepatic disorder up to and including transplant" and her "severe neuropathy."  He referred the plaintiff to a hepatologist and a neurologist, but she had not seen the specialists because she was uninsured (*id*.).

> The ALJ found as follows with regard to these opinions:
>
> I have also considered the October 2013 and February 2014 opinion of Dr. Insignares that the claimant is unable to work secondary to worsening liver function and end stage liver disease.  He also noted that the claimant was having difficulty lifting items, walking, and maintaining normal activities of daily living.  (Exhibits 40F and 48F).  I accord this opinion little weight, as it is inconsistent with the treatment notes and other evidence of record.  Specifically, treatment notes from October through December 2013 and January and March 2014 showed that the claimant's liver disease was generally controlled with medications.  Furthermore, there is no evidence that the claimant was ever recommended for a liver transplant.  (Exhibits 41F, 44F, 45F, and 49F).

(Tr. 29).

The plaintiff states in her brief that Dr. Insignares "opined she **needs a liver transplant** due to her condition" (pl. brief 11 (emphasis in original) (citing Tr. 1255)).  However, this is not what Dr. Insignares actually said; in the letter cited by the plaintiff, Dr. Insignares stated that, as the plaintiff's primary care physician, his office could not meet all of the plaintiff's needs, and, therefore, she should see a specialist to "obtain care for her end state hepatic disorder up to and including transplant" (Tr. 1255).  As to actual limitations, Dr. Insignares did state in one his letters that the plaintiff had "trouble" lifting

items, walking, and maintaining normal daily living activities, but he did not indicate to what degree the plaintiff was limited nor did he explain this statement (Tr. 1068). The ALJ accommodated these general restrictions to a certain extent by limiting the plaintiff to lifting/carrying up to ten pounds occasionally and lesser amounts frequently and standing/walking occasionally (Tr. 25). However, the ALJ reasonably found that the plaintiff's functional limitations were not so severe that they prevented her from performing a restricted range of sedentary work.

The plaintiff argues that the ALJ's findings that Dr. Insignares' opinions were inconsistent with treatment notes and that her conditions were well-controlled with medication are not supported by substantial evidence (pl. brief 11-12). The undersigned disagrees. With respect to the plaintiff's liver condition, as found by the ALJ, treatment records show that the plaintiff's medication controlled her symptoms and she retained at least a sedentary RFC. Specifically, in October 2010, the plaintiff reported to Dr. Insignares that she was feeling much better, her jaundice was clearing, and she had no gastrointestinal pain (Tr. 760-62, 765). Dr. Insignares's physical exams of the plaintiff, including her abdomen, were normal (Tr. 760-61, 763). By January 4, 2011, the plaintiff reported that she "feels better" as the edema in her abdomen and ankles resolved (Tr. 850). She was not drinking so her skin was clearing (Tr. 857), and her ammonia and liver function levels were improving (Tr. 872). On April 26, 2012, Dr. Bradford determined that the plaintiff's alcoholic cirrhosis was stable (Tr. 902).

Beginning in May 2012, the plaintiff started to drink again and was not complying with her medication (Tr. 913, 1051, 1053, 1139, 1142), which resulted in elevated ammonia levels (Tr. 1070). After being provided her with medication, her condition "markedly improved" (Tr. 1071). On October 31, 2013, the plaintiff admitted to Dr. Insignares that she was drinking occasionally and was "cutting back" on her medications (Tr. 1131). Dr. Insignares' examination revealed jaundice, "some ascites," and "some

16

hepatomegaly," but no neurological problems (Tr. 1133).  Dr. Insignares restarted the plaintiff on her regular medication and advised her to abstain from alcohol (Tr. 1135).  On November 13, 2013, the plaintiff went to the emergency room with complaints of abnormal lab results, but she reported no significant troubles with her liver (Tr. 1157). She admitted that she was drinking (Tr. 1157). The ultrasound showed minimal ascites (Tr. 1157, 1169). Dr. Eisenman discharged the plaintiff three days later in stable condition (Tr. 1159, 1161). On December 5, 2013, Dr. Eisenman conducted an esophagogastroduodenoscopy to check for esophageal varices (Tr. 1154). The procedure revealed "tiny esophageal varix" (Tr. 1155). Biopsies of the gastric mucosa showed no significant abnormalities (Tr. 1156). On January 28, 2014, the plaintiff's albumin serum was low at 2.7 g/dL, but Dr. Insignares's exam revealed a normal abdomen and no edema (Tr. 1264).  On March 4, 2014, the plaintiff reported that she was abstaining from alcohol, and her ammonia level was back in the normal range (Tr. 1257). Dr. Insignares did not note any ascites; rather, the plaintiff's abdomen was normal (Tr. 1259).

Likewise, with respect to the plaintiff's peripheral neuropathy, treatment records show that the plaintiff's medication controlled her symptoms and she retained at least a sedentary RFC.  Specifically, on January 4, 2011, Dr. Insignares' exam revealed decreased sensation in the plaintiff's feet, but thereafter, on March 7, April 8, May 16 and 25, 2011, and April 17 and December 4, 2012, Dr. Insignares' exams did not indicate any decreased sensation.  Rather, the musculoskeletal and neurological exams were normal (Tr. 856, 858, 944, 964, 966-67, 1057).  On March 1, 2013, the plaintiff complained of foot and hand numbness (Tr. 1051), and Dr. Insignares noted "decreased sensation" (Tr. 1052), but by November 22, 2013, Dr. Insignares's neurological exam did not reveal decreased sensation (Tr. 1128). On March 4, 2014, the plaintiff reported "some pain from peripheral neuropathy, but higher dose of Lyrica seems to help" (Tr. 1257). Dr. Insignares' exams in 2014 revealed "decreased sensation" in her feet (Tr. 1259, 1264, 1268), but the plaintiff

17

denied joint swelling and sensory disturbances (Tr. 1258, 1267). Therefore, as argued by the Commissioner, at the very most, the plaintiff's neuropathy caused intermittent decreased sensation in her feet that routinely resolved, and Lyrica successfully treated the symptoms. Thus, the ALJ reasonably found that Dr. Insignares' treatment notes did not support his unexplained conclusion that the plaintiff was disabled.

The plaintiff further argues that the ALJ "bases his decision on a physical RFC issued in February 2011 which is 3 years prior to the ALJ's decision" (pl. brief 12). The ALJ gave "great weight" to the opinions of the state agency medical and psychological consultants, finding the opinions were generally consistent with the other evidence of record (Tr. 29). The plaintiff cites the 2011 physical RFC assessment of state agency medical consultant Dr. Lang, who concluded that the plaintiff could occasionally lift/carry ten pounds, frequently lift/carry less than ten pounds, and stand/walk at least two hours and sit about six hours in an eight-hour workday (Tr. 828).

The ALJ reasonably gave this opinion great weight because it was consistent with the other evidence of record (Tr. 29). The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in

18

the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).   Furthermore, an ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision. *Thacker v. Astrue*, No. 11-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012). Here, the ALJ considered Dr. Lang's opinion, as required, and then properly evaluated the opinion in the context of entire record, including the evidence that came after the opinion. The ALJ reasonably concluded that Dr. Lang's opinion was consistent with the objective evidence.

Based upon the foregoing, the undersigned finds that the ALJ did not err in giving little weight to Dr. Insignares' opinions and further finds that substantial evidence supports the ALJ's assessment of the plaintiff's RFC.

### Listing 5.05

The plaintiff argues that the ALJ failed to properly consider Listing 5.05 as she meets the criteria for Listing 5.05(A) and (B) (pl. brief 12-14).   Listing 5.05 requires, as relevant here:

> Chronic liver disease, with:
>
> A. Hemorrhaging from esophageal, gastric, or ectopic varices or from portal hypertensive gastropathy, demonstrated by endoscopy, x-ray, or other appropriate medically acceptable imaging, resulting in hemodynamic instability as defined in 5.00D5, and requiring hospitalization for transfusion of at least 2 units of blood. Consider under disability for 1 year following the last documented transfusion; thereafter, evaluate the residual impairment(s). OR
>
> B. Ascites or hydrothorax not attributable to other causes, despite continuing treatment as prescribed, present on at least 2 evaluations at least 60 days apart within a consecutive 6-month period. Each evaluation must be documented by:
>     1. Paracentesis or thoracentesis; or

19

> 2. Appropriate medically acceptable imaging or physical
> examination and one of the following:
>> a. Serum albumin of 3.0 g/dL or less; or
>> b. International Normalized Ratio (INR) of at least
>> 1.5 . . . .

20 C.F.R. pt. 404, subpt. P, app. 1, §5.05.

> The listing of impairments further provides:

> Under 5.05A, hemodynamic instability is diagnosed with signs
> such as pallor (pale skin), diaphoresis (profuse perspiration),
> rapid pulse, low blood pressure, postural hypotension
> (pronounced fall in blood pressure when arising to an upright
> position from lying down) or syncope (fainting). Hemorrhaging
> that results in hemodynamic instability is potentially
> life-threatening and therefore requires hospitalization for
> transfusion and supportive care. Under 5.05A, we require only
> one hospitalization for transfusion of at least 2 units of blood.

> 6. Ascites or hydrothorax (5.05B) indicates significant loss of
> liver function due to chronic liver disease. We evaluate ascites
> or hydrothorax that is not attributable to other causes under
> 5.05B. The required findings must be present on at least two
> evaluations at least 60 days apart within a consecutive 6-month
> period and despite continuing treatment as prescribed.

*Id.* §5.00(D)(5), (6).

> The ALJ found as follows in his listing analysis:

> I have considered whether the claimant's alcoholic
> hepatitis/cirrhosis meets or medically equals Listing 5.05.
> However, the record fails to show evidence of: a) hemorrhaging
> from esophageal, gastric, or ectopic varices or from portal
> hypertensive gastropathy; b) ascites or hydrothorax not
> attributable to other causes; c) spontaneous bacterial peritonitis
> wither peritoneal flud containing an absolute neutrophil count of
> at least 250 cells/mm3; d) hepatorenal syndrome; 2)
> hepatopulmonary syndrome; f) hepatic encephalopathy; or g)
> end stage liver disease with chronic liver disease scores fo 22
> or greater. Accordingly, I find that the claimant's alcoholic
> hepatitis/cirrhosis does not meet or medically equal Listing
> 5.05.

(Tr. 23).

The plaintiff specifically contends that her liver condition meets Listing 5.05(A) as of September 23, 2010, when she was hospitalized and given two units of blood, and therefore, she should be considered disabled for a year following that transfusion (pl. brief 13). *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §5.05(A).   However, as argued by the Commissioner, the record indicates that she received the blood transfusion in September 2010 for "rectal bleeding" or "a lower GI bleed"  – not because of hemorrhaging from esophageal, gastric, or ectopic varices or from portal hypertensive gastropathy, as required by Listing 5.05(A) (Tr. 740-42, 754).

The plaintiff further contends that she meets Listing 5.05(B) due to ascites and serum albumin of 3.0 or less in October 2013 and January 2014 (pl. brief 13). A qualifying incident must meet both a clinical and diagnostic component. Clinically, the claimant must prove that she has ascites. 20 C.F.R. pt. 404, subpt. P, app. 1, § 5.05(B). Diagnostically, she must show a serum albumin score of 3.0 g/dL or less. *Id*. If the evaluation establishes both the clinical and diagnostic component, then she has a qualifying incident. To meet the listing, she must have two qualifying incidents at least sixty days part within a consecutive six month period that must occur "despite continuing treatment as prescribed." *Id*.

On October 29, 2013, the plaintiff's laboratory results showed her serum albumin was at 2.8 (Tr. 1075). On November 12, 2013, laboratory results show her albumin was at 2.8 again (Tr. 1130). On November 14, 2013, laboratory results revealed decreased serum albumin to 1.9 and INR of 1.77 (Tr. 1159). On January 8, 2014, her lab work showed her serum albumin remained low at 2.9 (Tr. 1269).  On January 23, 2014, her lab work was essentially the same with her serum albumin down to 2.7 (Tr. 1264).

While the plaintiff's serum albumin levels were 3.0 g/dL or less, the above laboratory results do not meet the criteria of Listing 5.05(B) because two qualifying incidents of at least sixty days apart within a consecutive six month period must occur "despite continuing treatment as prescribed." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §5.05(B). Here,

21

as discussed by the ALJ, treatment notes show that the plaintiff did not comply with her doctor's orders and stopped or decreased her medication on her own (Tr. 28; *see* Tr. 943 (April 17, 2012: the plaintiff stated that she had stopped medicines); Tr. 1056 (December 4, 2012: the plaintiff "had been cutting back on her meds"); Tr. 1139, 1142 (October 8-11, 2013: the plaintiff was not complying with her medications, and she was combining her medications with alcohol); Tr. 1131 (October 31, 2013: admitting that she was drinking occasionally and was "cutting back" on her medications); Tr. 1157 (November 13, 2013: admitting that she was still drinking)). Therefore, the above measurements do not qualify because the plaintiff was not complying with prescribed treatment.

Moreover, as argued by the Commissioner, the plaintiff has not established the clinical component of 5.05(B). The plaintiff cites the November 14, 2013, ultrasound that revealed ascites[2] (Tr. 1157) and a December 5, 2013, procedure that revealed ascites of her liver (Tr. 1154-55) (pl. brief 13; pl. reply 3). However, the plaintiff has not shown the "required findings . . . present on at least two evaluations at least 60 days apart within a consecutive 6-month period and despite continuing treatment as prescribed." 20 C.F.R. pt. 404, subpt. P, app. 1, §5.00(D)(6). Accordingly, substantial evidence supports the ALJ's finding that the plaintiff did not meet Listing 5.05.

The plaintiff makes a passing alternative argument that the ALJ erred "by failing to obtain a medical expert to opine whether [her] liver disease equals the listing" (pl. brief 12, 14). The ultimate decision on whether a claimant meets or equals a Listing is a matter reserved to the ALJ. 20 C.F.R. §§ 404.1527(e), 404.1526(e). The ALJ should receive expert opinion evidence with respect to the Listing analysis. *See id.* § 404.1526(c) (in

---

[2]The plaintiff states that the November 14, 2013, ultrasound revealed "significant ascites" (pl. reply 3 (citing 1069-71)). However, the transcript pages cited by the plaintiff are treatment notes dated October 29, 2013, that do not discuss an ultrasound. Treatment notes from November 14, 2013, reveal that an ultrasound of the abdomen on that date "showed minimal ascites" (Tr. 1157).

22

determining if an impairment equal a listing, we consider the opinion given by medical consultants designated by the Commissioner). A signed Form SSA–831 may satisfy the requirement of receiving expert opinion evidence into the record. SSR 96–6p, 1996 WL 374180, at *3 (the signature of a state agency medical consultant on form SSA–831 ensures that consideration by a physician designated by the Commissioner has been given to the question of medical equivalence). Here, the record includes Disability Determination and Transmittal Forms (Form SSA-831) signed by Mary S. Lang, M.D. (Tr. 115-17). Accordingly, this undeveloped argument is without merit.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 12, 2016
Greenville, South Carolina

23